**NEW YORK MARINE & GENERAL INSURANCE CO., Braha Industries, Inc., Plaintiffs,**

v.

**S/S "MING PROSPERITY," her engines, tackle boilers, etc., Yang Ming Marine Transport Corporation, Yang Ming Line, The Atchison, Topeka and Santa Fe Railway Company, Defendants.**

No. 94 Civ. 5082(LAK).

United States District Court, S.D. New York.

Feb. 22, 1996.

Robert J. Plansker, Robert J. Giuffra, Dougherty, Ryan, Giuffra, & Zambito, New York City, for Plaintiff.

Joseph F. De May, Jr., Paul M. Keane, Chicanowicz, Callan & Keane, New York City, for Defendant Yang Ming.

Ilene J. Feldman, Barry N. Gutterman & Associates, New York City, for Defendant Atchison, Topeka and Santa Fe Railway.

KAPLAN, District Judge.

This is an action to recover for the nondelivery of cargo that was shipped from overseas and destroyed during inland carriage in the United States. Plaintiffs' motion for summary judgment has elicited a complicated interchange among the parties, creating disputes over jurisdiction, the law governing this action, liability, and the amount of damages available to plaintiffs.

*Facts*

Braha Industries, Inc. ("Braha") is an importer of footwear and other merchandise from overseas markets, primarily from China. (Kolodny Dep. 5) In response to purchase orders from four American retail companies, Braha ordered 14,400 pairs of shoes from China Gate Company ("China Gate"), a manufacturer in Hong Kong. (Plansker Aff. ¶ 4, Ex. J)

China Gate shipped a container of footwear to Braha on a vessel called the S/S MING

PROSPERITY pursuant to a bill of lading issued by Yang Ming and dated July 17, 1993. The bill of lading listed one container, described as carrying 800 cartons according to shipper's load and count. It listed China Gate Co. as the shipper and Braha as the notify party. It designated Hong Kong as the Port of Loading, Los Angeles as the Port of Discharge, and New York as the Place of Delivery. Yang Ming arranged for inland carriage from Los Angeles to the Port of New York by the Atchison, Topeka, and Santa Fe Railway Corporation ("ATSF").

The shipment of footwear was destroyed during inland carriage en route from Los Angeles as a result of a derailment and fire that occurred in Arizona on August 8, 1993. Braha was notified of the cargo destruction by letter dated August 13, 1993. (Plansker Aff. ¶ 7, Ex. B) New York Marine & General Insurance ("New York Marine"), as Braha's subrogee, and Braha filed this suit against defendants Yang Ming and ATSF in July 1995.

### Terms of the Bill of Lading

Three provisions of the bill of lading are especially pertinent here. Clause 5 of the bill of lading states that, in certain circumstances, liability of the carrier shall be determined in accordance with the Carriage of Goods by Sea Act of the United States ("COGSA"), 46 U.S.C.A.App. 1300 *et. seq.* Clause 26(1) states that all claims for which the carrier may be liable shall be adjusted based on the "net invoice value of the goods" and that in no event should the Carrier be liable for loss of profit or consequential damages. Clause 22 states that freight shall be considered completely earned by the carrier "under all circumstances whatsoever Ship and/or cargo lost or not lost." The effect and enforceability of these clauses lie at the heart of the motion crossfire.

### Plaintiffs' Damage Claim

Plaintiffs claim damages in the amount of $87,665.62, which, they say, is comprised of $6,513.47 in shipping costs, $152.25 in bank fees, and $81,000 in cargo loss[1] (*See* Pl's Mem. 11; Plansker Aff. ¶ 15) A commercial invoice prepared by China Gate for the 800 cartons of shoes in connection with the Yang Ming shipment lists the value of the footwear as $51,282. The $81,000 figure represents plaintiffs' estimation of the sound market value of the footwear, and it is based on the prices of the resale contracts for the shoes, which had been sold in advance of shipment. (*See* Plansker Aff. ¶ 17 & Exs. D–H; Pl. Mem. 11) Both defendants dispute plaintiffs' inclusion of the profits that would have been obtained from the resale contracts had the shoes been delivered, and Yang Ming disputes the inclusion of ocean freight charges and bank fees. The resolution of the damage disputes depends heavily on what law governs, a point which the parties dispute hotly.

### Discussion

### Disputes Between Plaintiffs and Yang Ming

In opposing plaintiffs' motion for summary judgment, defendant Yang Ming contests the existence of admiralty jurisdiction and argues that plaintiffs inadequately established liability and damages.

### Admiralty Jurisdiction

Admiralty jurisdiction traditionally exists in contract cases if the contract sued upon is "wholly maritime in nature." If the contract contains both maritime and non-maritime obligations, admiralty jurisdiction generally is absent. *Atlantic Mutual Ins. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 199 (2d Cir.1992). There are two important exceptions, however. Admiralty jurisdiction exists, despite the presence of non-maritime obligations, if: (1) the claim under the maritime portion can be separately enforced without prejudice to the rest or (2) the non-maritime elements are merely incidental to an otherwise maritime contract. *Sirius Ins. Co. Ltd. v. Collins,* 16 F.3d 34, 36 (2d Cir. 1994); *Atlantic Mutual,* 968 F.2d at 199. The Court's central concern in appraising these matters is the fundamental interest giving rise to maritime jurisdiction, the protection of maritime commerce. *Sirius* 16 F.3d at 36; *Atlantic Mutual,* 968 F.2d at 199–200.

In this case, the contract provided for land transportation of the shoes from the

---

1. The figures ($6,513.47 + 152.25 + $81,000) actually total $87,665.72.

Port of Los Angeles to New York. It therefore involved a non-maritime obligation. Neither of the two exceptions in *Atlantic Mutual* applies. The first exception does not apply because the loss occurred during the non-maritime leg of the journey, thus making severability of the non-maritime portion impossible for purposes of resolving this claim. The second exception does not apply because the land transportation may not be considered incidental given the large distance involved. *See Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 881 (3d Cir.1992) (if the bill of lading was a contract for partial sea and partial land transport, it would not give rise to admiralty jurisdiction; the extensive cross-United States transport of goods would not be an incidental aspect of the contract, nor could the land and sea portions appropriately be severed); *Rudy–Patrick Seed Co. v. Kokusai Kisen Kabushiki Kaisha*, 1 F.Supp. 266, 267 (S.D.N.Y. 1932) (portion of transportation involving land carriage fell outside the scope of admiralty jurisdiction); [2] *see also Graham v. Oregon R. & Nav. Co.*, 134 F. 454 (D.C.N.Y.1904) (agreement between a railroad company and the owner of certain steamships to cooperate in operating a through line of transportation was not maritime in nature, and a court of admiralty is without jurisdiction over a suit for its breach).

*Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800 (2d Cir.1971), in which the Court of Appeals held that the existence of admiralty jurisdiction in contract actions cannot be determined simply on the basis of whether the alleged damage occurred on land, is not to the contrary. In *Leather's Best*, a shipping company successfully shipped a container of goods from Weinheim, Germany to Brooklyn, New York. Upon arrival in Brooklyn on a Saturday, the undamaged container was unloaded and placed in a large terminal owned and operated by the shipping company to await pick up on the following Monday morning. The goods were stolen in the interim. The Court held:

> "While the loss of the container occurred after the act of carriage had been completed and the container had been discharged from the [ship], that does not mean that the contract of carriage, obviously a maritime contract, was at an end; the contract continues to govern the relationship between a shipper and carrier after discharge but before delivery. Such was our holding in *David Crystal, Inc. v. Cunard S.S. Co.*, 339 F.2d 295, 297 (2d Cir.1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965). Consequently, the shipper's claims against [the carrier] is [*sic*] properly within federal admiralty jurisdiction." 451 F.2d at 807.

The broad language in *Leather's Best* at first seems to favor the exercise of maritime jurisdiction, but on closer analysis the case is distinguishable. Although both *Leather's Best* and *David Crystal Inc.*, upon which it relied, involved injury to the cargo after unloading and before the shipper's receipt of the goods, neither case involved a second carriage of the goods on land over any appreciable distance. Thus, any land obligation more easily could be deemed incidental to the marine transportation in those cases than in the instant action.

Nor does *Sirius*, where the Second Circuit reiterated that maritime jurisdiction may exist where the dispute arises out of damage to cargo occurring on land, warrant a different result. The Second Circuit there held that a dispute concerning an insurance policy, which turned on a theft warranty relating to out of water storage, fell within maritime jurisdiction. But the basis for the Court's conclusion that the dispute was primarily maritime in nature was the fact that the policy covered a boat, which has "an inherently maritime character." 16 F.3d at 36. This conclusion was consistent with the Second Circuit's previous recognition of the "well-settled" princi-

---

**2.** In *Rudy–Patrick*, the bill of lading specifically provided for two stages of transportation, one of which was to be performed by a series of connecting railroads. 1 F.Supp. at 267. In this case, the Yang Ming bill of lading stated Los Angeles, CA as the place of delivery and New York as the place of delivery; an asterisk next to the place of delivery noted the term was "[a]pplicable only when used as Combined Transport B/L." (Plansker Aff. Ex. A) This provision establishes the contemplation of land transportation, albeit less explicitly than the bill of lading in *Rudy–Patrick*.

ple that admiralty jurisdiction extends to suits involving maritime insurance policies. *Atlantic Mutual,* 968 F.2d at 199. Here, in contrast, there is nothing inherently maritime about a container of shoes. Moreover, given that the shoes had ended their connection with the flow of maritime commerce upon reaching Los Angeles, the connection to maritime commerce is too attenuated to find admiralty jurisdiction.

■ The lack of maritime jurisdiction here is all the more clear to the extent that plaintiffs seek a remedy in tort, rather than in contract.[3] In numerous tort cases, the Second Circuit has held unequivocally that no maritime jurisdiction exists if the alleged damage occurred during any land portion of transportation. *See, e.g., Roco Carriers Ltd. v. Nurnberg Express,* 899 F.2d 1292, 1295 (2d Cir.1990) (inasmuch as the tort claim against defendant arose while cargo was on land, plaintiffs' claim is not within the district court's admiralty jurisdiction).

*Diversity Jurisdiction*

While admiralty jurisdiction is lacking, plaintiffs seek leave to amend to premise jurisdiction on diversity of citizenship. Their reply brief asserts that: (1) defendant Yang Ming is a foreign corporation with a principal place of business in Taipei, Taiwan, Republic of China; (2) defendant ATSF is a foreign corporation with a principal place of business in Topeka, Kansas; and (3) both New York Marine and Braha Industries, the plaintiffs, are New York corporations with principal places of business in New York City. As these facts are uncontested by defendants, and the jurisdictional amount is present, plaintiffs' request to amend their complaint is granted. The analysis will proceed on the basis that diversity jurisdiction exists.

*State Law Governs in Absence of Admiralty Jurisdiction*

■ Yang Ming contends that liability and damages are governed by COGSA because it has been incorporated into the bill of lading in Clause 5.[4] However, even if the parties incorporated COGSA into the contract, the rule in this circuit is that where federal admiralty jurisdiction is lacking, incorporated provisions of COGSA control only insofar as they do not conflict with applicable state law. *Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 315 (1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984) (interpreting *Leather's Best,* 451 F.2d at 808). *Contra, Wemhoener Pressen v. Ceres Marine Terminals, Incorp.,* 5 F.3d 734, 740 (4th Cir.1993) (rejecting Second Circuit approach). Thus, in the absence of maritime jurisdiction, the claim is governed in essence by applicable state law, here the law of New York.[5]

---

**3.** Indeed the complaint, while asserting admiralty jurisdiction, stated that "[p]laintiffs seek recovery for cargo loss caused by defendants' breaches of contract[,] [*sic*] and tort." (Cpt ¶ 1) Plaintiffs' moving papers did not elaborate on any particular tort theories of recovery.

**4.** Clause 5(B) states:

"Where loss and damage has occurred between the time of receipt of the goods by Carrier at the port of loading and the time of delivery by the Carrier at the port of discharge, or during any prior or subsequent period or carriage by water, and when such carriage is from or to ports in the United States, the liability of the Carrier shall be determined in accordance with the Carriage of Goods by Sea Act of the United States, 46 U.S.C. 1300 et seq."

**5.** A court having diversity jurisdiction must apply the law of the forum state, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The conflict of law rules of the forum state, New York, require applying the law of the state which has the greatest interest in or most significant relationship to the transaction and the parties. *See, e.g., Index Fund, Inc. v. Insurance Co. Of North America,* 580 F.2d 1158, 1162 (2d Cir.1978), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979); *Stroll v. Epstein,* 818 F.Supp. 640, 643 n. 2 (S.D.N.Y.), *aff'd,* 9 F.3d 1537 (2d Cir.1993). Here, the state with the greatest interest in resolving the disputes flowing from nondelivery of the cargo is New York, for three reasons. First, since New York was the place of delivery, an important part of the contract was to be carried out there. Second, Braha, the intended receiver of the goods, resides in New York. Third, it was entirely foreseeable to all the parties that the nondelivery would injure Braha's New York business. In contrast, Arizona, the state where the fire destroyed the cargo, has no more than a serendipitous connection to this dispute. Hong Kong has no great interest either, since the record indicates that, at most, the contract may have been created there. *See also Ralph Hochman & Co. v. Fort Stanwix Mfg. Co.,* 284 F.Supp. 1000

*Liability*

■ Yang Ming contends that plaintiffs have not established a *prima facie* case of liability.

Under COGSA, a consignee establishes a *prima facie* case of by showing (1) delivery of the goods to the carrier in good condition and (2) outturn by the carrier in damaged condition. If this is established, the burden then shifts to the carrier to show that any loss falls within one of COGSA's exception. *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982); *Judy–Philippine Inc. v. S/S Verazano Bridge,* 781 F.Supp. 253, 258 (S.D.N.Y.1991).

■ Ordinarily, a bill of lading stating quantity and weight, regardless of attempted reservations like "said to weigh" or "contents of packages are shipper's declaration," satisfies the first requirement. *Westway Coffee,* 675 F.2d at 32; *Judy–Philippine,* 781 F.Supp. at 258. Where the cargo is delivered to the carrier in a sealed container packed by the shipper, however, the bill of lading alone is insufficient evidence of the amount or condition of the goods because the carrier cannot readily inspect them. *See, e.g., Bally, Inc. v. M.V. Zim America,* 22 F.3d 65, 69 (2d Cir.1994); *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 353 (2d Cir.1981).[6] In *Bally,* for example, the court found that the shipper's count of cartons in sealed containers, as stated in the bill of lading, did not make out *prima facie* evidence of liability where the shipper claimed that a number of cartons packed in containers were missing eight days after receipt and the containers had not been weighed at outturn. 22 F.3d at 69. In those circumstances, the court held that "some other evi-

dence was needed to establish the number of cartons" that had been loaded. *Id.*

If COGSA controls, plaintiffs would have established a *prima facie* case of liability under *Bally.* *Bally* simply requires some evidence beyond the shipper's count in the bill of lading to establish *prima facie* liability as to a specific number of cartons inside a sealed container. This record contains such evidence.

First, plaintiffs have produced a commercial invoice prepared by China Gate and dated July 17, 1993, the same date as the Yang Ming bill of lading, which describes in detail the 800 cartons of footwear to be shipped aboard the MING PROSPERITY on or about that date. The footwear cartons are listed according to item number, quantity, and unit price in this document. (Plansker Aff. Ex. J)

Second, plaintiffs produced a packing and weight list prepared by China Gate. This document too relates to a shipment aboard the MING PROSPERITY, and the weight of all the cartons listed is 14,600 kilograms,[7] the same weight listed on the Yang Ming bill of lading. (*Compare id.* Ex. A with *id.* Ex. K) Nothing on the bill of lading qualifies the weight listed as the weight according to the shipper, so the bill is *prima facie* evidence of the weight. The packing weight list, corresponding as it does to Yang Ming's unqualified acceptance of a container of the same weight, thus further corroborates the showing that Yang Ming received precisely what plaintiffs claim was shipped.

This evidence cumulatively suffices to establish a *prima facie* of case of liability under COGSA for 800 cartons of footwear. *Cf. United States v. Louisville and Nashville R.R. Co.,* 389 F.Supp. 250, 251 (M.D.Ala.

(N.D.N.Y.1968) (New York law applies where contract, although not created in New York, involved the sale in New York of a New York corporation's assets); *cf. Southern Express Co. v. Gibbs,* 155 Ala. 303, 46 So. 465, 466 (1908) (where goods were to be shipped by carrier from New York to Alabama, the contract, so far as delivery was involved, was to be performed wholly within Alabama and therefore the carrier's liability for failure to deliver depended on the law of Alabama).

6. The rule originated with respect to perishable goods in cases where the consignee received the goods in allegedly damaged condition. *Caemint* (moldy corned beef); *The Niel Maersk,* 91 F.2d 932 (2d Cir.), *cert. denied,* 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937) (decayed sardine meal).

7. This sum is obtained by adding the number of each carton multiplied by the weight of each carton as follows: 100(22 kgs) + 100(22 kgs) + 150(16 kgs) + 150(16 kgs) + 300(18 kgs).

1975) (affidavit that, if believed, corroborated a "shipper's load and count" bill of lading, satisfied plaintiff's burden of establishing *prima facie* liability). Indeed, Yang Ming presented no evidence to the contrary.

■ New York law yields the same result. A common carrier's unrebutted evidence that a package was sent but not delivered establishes the carrier's liability for non-delivery of the consigned items. *Art Masters Associates, Ltd. v. United Parcel Services,* 139 Misc.2d 888, 890, 528 N.Y.S.2d 755, 757 (Sup. Ct.Kings Co.1988), *modified on other grounds,* 153 A.D.2d 41, 549 N.Y.S.2d 495, *rev'd on other grounds,* 77 N.Y.2d 200, 566 N.Y.S.2d 184, 567 N.E.2d 226 (1990).[8] Consistent with *Bally,* Section 7–301 the New York Uniform Commercial Code limits the responsibility of carriers to ascertain the kind and quantity of freight in concealed packages.[9] It also holds a carrier liable for nondelivery of goods stated in a bill of lading "except to the extent that the document indicates that the issuer *does not know* whether any part or all of the goods in fact were received or conform to the description ... [as where the] description is qualified by 'contents or condition of contents of packages unknown,' 'said to contain,' 'shipper's weight, load and count' or the like." N.Y.Unif. Comm.Code § 7–301(1) (McKinney 1990) (emphasis added). Nevertheless, there is no reason to believe that the same evidence that would establish a *prima facie* case under COGSA would fail to do so under the law of New York.

■ As there is no evidence rebutting or challenging the *prima facie* showing, the Court concludes that plaintiffs are entitled to summary judgment as to Yang Ming's liability for the 800 cartons of shoes.

### Damages

Yang Ming and plaintiffs disagree vigorously about the amount of damages plaintiffs may recover. Plaintiffs seek to recover $81,-000 for the cargo loss, a figure representing the resale price of the shoes, plus shipping and banking fees. Yang Ming contends that Clause 26(1)[10] of the bill of lading precludes recovery of lost profits and that Clause 22[11] precludes recovery of shipping costs, thus limiting plaintiffs' recovery to $51,282, the invoice value of the goods. Plaintiffs contend that both clauses are unenforceable under COGSA, 46 U.S.C.A.App. § 1303(8), which voids attempted limitations of liability not otherwise provided for under COGSA. In view of the lack of admiralty jurisdiction, however, Section 1303(8) controls (by virtue of its incorporation into the bill of lading) only to the extent it is consistent with New York law. Hence, the fundamental question is whether Clauses 26(1) and 22 are valid under New York law.[12]

---

**8.** The portion of the *Art Masters* opinion that was modified related to a different point, namely whether federal or state law governs the claim for conversion and the substance of that law.

**9.** Section 7–301(2) provides: "When goods are loaded by an issuer who is a common carrier, the issuer must count the packages of goods if package freight and ascertain the kind and quantity if bulk freight. In such cases shipper's weight, load and count or other words indicating that the description was made by the shipper are ineffective *except as to freight concealed by packages.*" N.Y.Unif.Comm.Code § 7–301(2) (McKinney 1990) (emphasis added).

**10.** Clause 26(1) provides in relevant part: "All claims which the Carrier may be liable for shall be adjusted and settled on the basis of the net invoice value of the Goods. In no event shall the Carrier by liable for any loss of profit or any consequential loss." (Plansker Aff. Ex. A)

**11.** Clause 22 provides in relevant part:

"Full freight hereunder ... in case of through or combined transport to the place of delivery named herein shall be considered completely earned on the receipt of goods by the Carrier ... and the Carrier shall be entitled to all freight and charges due hereunder, whether actually paid or not and to receive and retain them under all circumstances whatsoever Ship and/or cargo lost or not lost." (Plansker Aff. Ex. A)

**12.** Apart from any valid contractual limitations of liability, the measure of damages under COGSA is typically the "market value of the goods at the time and place they were to have been delivered." *Seguros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 861 (2d Cir.1985). According to *Seguros,* this calculation establishes the "the amount necessary to put the injured parties in the exact position they would have been in had there been no breach." *Id.* at 860–61. The fair market value test is " 'at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate

**424**

■ New York law makes clear that parties may contract to limit the liability of a carrier, even for gross negligence, provided the language of the limitation is clear, the shipper is aware of the terms of the limitation, and the shipper can change the terms by indicating the true value of the goods being shipped. *Calvin Klein Ltd. v. Trylon Trucking Corp.*, 892 F.2d 191, 194–95 (2d Cir.1989) (relying on 17 N.Y.Jur.2d, *Carriers* § 294 (1981) and N.Y.Unif.Comm.Code § 7–309(2)).

■ These requirements are met with respect to the liability limitations in Clause 26(1).[13] First, the language of Clause 26(1) plainly requires adjustment according to the invoice value and prohibits recovery of lost profits. Second, a signature of Braha on the bill of lading evidences awareness of its terms. Third, Clause 26(2) enables the shipper to declare a higher value of the goods in exchange for payment of higher freight.[14] Accordingly, plaintiffs may not recover the resale value of the shoes, which includes lost

profits,[15] or the bank fees, which are a form of consequential damages.

Similarly, the freight and shipping charges are not recoverable because of the clear language of Clause 22, which states that freight charges are earned in full when the carrier receives the goods at the load port and may be retained even if the cargo is lost. Consequently, plaintiffs may not recover for any of the freight or charges,[16] such as tax and duties, in view of Clause 22.[17]

In sum, plaintiffs are entitled to summary judgment against Yang Ming in the amount of $51,282. (*See* Plansker Aff. Ex. J) Yang Ming is entitled to summary judgment dismissing plaintiffs' claim to the extent it exceeds that amount.

*Disputes Between Plaintiffs and ATSF*

Plaintiffs seek summary judgment against ATSF on a bailment theory for the same amount of damages sought against Yang Ming, $87,655.22. Defendant ATSF counters that the dispute is governed by the Carmack Amendment to the Interstate Commerce Act,

---

measures resorted to if, for special reasons, it is not exact *or otherwise not applicable.'*" *Kanematsu–Gosho Lt. v. M/T Messiniaki Aigli*, 814 F.2d 115 (2d Cir.1987) (citing *Illinois Central R.R. Co. v. Crail*, 281 U.S. 57, 64–65, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930)).

13. It is therefore unnecessary to resolve whether COGSA would render Clause 26(1) unenforceable, as plaintiffs contend, based on *Plywood Panels, Inc. v. M/V Sun Valley*, 804 F.Supp. 804, 812 (E.D.Va.1992) *aff'd*, 4 F.3d 986 (4th Cir.1993) (unpublished disposition) (holding a similar clause enforceable under COGSA, but largely because the parties themselves had settled other claims based on the invoice cost, insurance, and freight, rather than the market value at the time and place of delivery).

14. Clause 26(2) of the Bill of Lading states in relevant part:

"The carrier shall not be liable for loss or damage in an amount exceeding Three Hundred U.S. Dollars (US $300.00) per Package or per customary [*sic*] freight unit, unless the value of the Goods higher than this amount has been declared in writing by the Merchat [*sic*] before receipt of the Goods and inserted in this bill of lading together with the nature thereof and extra freight has been paid as required."

15. In addition lost profits are treated regularly as a type of "consequential damage." *See, e.g., Hudson Feather & Down Products, Inc. v. Lancer Clothing Corp.*, 128 A.D.2d 674, 675, 513

N.Y.S.2d 173, 174 (2d Dept.1987) (referring to "lost profits and other consequential damages" in reference to N.Y.Unif.Comm.Code § 2–712 to 2–715); *Columbe v. New York Telephone Co.*, 102 A.D.2d 909, 909, 477 N.Y.S.2d 490, 491 (3d Dept.1984) (referring to the "recovery of consequential damages for apparent loss of profit" in tort action).

16. Other portions of Clause 22 indicate that the term "charges" includes costs such as taxes and duties. For example, the clause states, "The merchant shall be liable to the Carrier for the payment of all charges. The merchant shall be liable for and indemnify the Carrier against all dues, duties, taxes and charges including consular fees levied on the goods." This discussion occurs under the header "freight and charges," in which the paragraph repeatedly says that the carrier shall not be liable for such charges in any circumstances. Alternatively, the charges for taxes and duties are not recoverable because they are a form of consequential damages, which are precluded by the language of Clause 26(1).

17. Clause 22 may be unenforceable under COGSA, as one case held that a nearly identical clause was to be construed strictly so as to excuse only reasonable deviations, and destruction of cargo is arguably an unreasonable deviation. *Cf. Hellenic Lines, Ltd. v. United States*, 512 F.2d 1196, 1204 (2d Cir.1975). In view of the Court's conclusion as to New York law, this point need not be decided.

49 U.S.C. § 11707 (West 1995), formerly, 49 U.S.C. § 20(11) (1976), and cross-moves for summary judgment limiting any recovery by plaintiffs to $57,670.47, which ATSF describes as the invoice amount of the goods plus freight charges and duties.

*The Carmack Amendment*

■ The Carmack Amendment does not govern this case for reasons explained lucidly in *Capitol Converting Equipment Inc. v. Lep Transport, Inc.,* 750 F.Supp. 862, 863–64 (N.D.Ill.1990), *aff'd,* 965 F.2d 391 (7th Cir. 1992).

Before 1978, the Carmack Amendment governed transportation "from a point in one State or Territory or the District of Columbia to a point in another state, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country." 49 U.S.C. § 20(11) (1976). The Carmack Amendment did not cover goods shipped under a through bill of lading issued in a foreign country. *Capitol Converting,* 750 F.Supp. at 864 (citing, e.g., *Reider v. Thompson,* 339 U.S. 113, 117, 70 S.Ct. 499, 502, 94 L.Ed. 698 (1950)). In 1978, the Carmack Amendment was amended, and the coverage of certain shipments involving transportation outside the United States was expanded.

Thereafter, several courts revisited the issue decided in *Reider* and adopted the following rule: Where a shipment involves transportation in a foreign county, the "domestic leg of the journey will be subject to the Carmack Amendment as long as the domestic leg is covered by a separate bill or bills of ladings." *Swift Textiles v. Watkins Motor Lines Inc.,* 799 F.2d 697, 701 (11th Cir.1986), *cert. denied,* 480 U.S. 935, 107 S.Ct. 1577, 94 L.Ed.2d 768 (1987) *cited in Capitol Converting,* 750 F.Supp. at 862; *accord, Lucky–Goldstar Int'l v. S/S. California Mercury,* No. 89 Civ. 8591 (PKL), 1991 WL 12144 *2, 1991 A.M.C. 1025 (S.D.N.Y.1991); *Fine Foliage of Florida, Inc. v. Bowman Transp., Inc.,* 698 F.Supp. 1566, 1571 (M.D.Fla.1988), *aff'd,* 901 F.2d 1034 (11th Cir.1990). The Amendment, however, does not apply where a through bill of lading covers the entire course of an international journey. *Lucky Goldstar,* at *2; *Capitol Converting,* 750 F.Supp. at 864.

■ The question whether a through bill of lading was issued abroad depends on the facts. *Capitol Converting,* 750 F.Supp. at 864. The circumstances relevant to the determination include (1) the final destination indicated in the bill of lading; (2) the conduct of the shipper and carriers; and (3) and whether the connecting carriers were compensated by the payment made to the initial carrier or by separate consideration from the shipper. *Lucky–Goldstar* at *2; *Capitol Converting,* 750 F.Supp. at 864.

■ The Yang Ming bill of lading was the only contract signed and satisfies all the criteria of a through bill of lading. It identified Hong Kong as the Port of Loading, Los Angeles as the Port of Discharge, and New York as the Place of Delivery. An asterisk next to the box titled "Place of Delivery" noted that the item was "[a]pplicable only when document used as a Combined Transport." Nearly identical language supplied the basis for another court to conclude that a bill on its face "appear[ed] to 'contemplate[ ] the use of other carriers to effect inland transportation' ... and to refer, at least indirectly, to 'through' transportation." *Capitol Converting,* 750 F.Supp. at 864 (citing *Tokio Marine & Fire Ins. Co. v. Hyundai Merchant Marine Co.,* 717 F.Supp. 1307, 1309 (N.D.Ill.1989) and *Austracan (U.S.A.) Inc. v. Neptune Orient Lines Ltd.,* 612 F.Supp. 578 (S.D.N.Y.1985)). Here it is plain that neither the shipper, the consignee, nor the notify party was issued a separate contract for the rail carriage. Yang Ming made all the arrangements and compensated ATSF for the land-based carriage of the cargo. (Pl. Reply 23) Accordingly, this was a through bill of lading issued abroad, and the Carmack Amendment does not apply.

*State Bailment Law*

■ Plaintiffs assert that defendant ATSF is liable under New York law as a bailee, which was "engaged in fulfilling" Yang Ming's "obligation following the discharge of the cargo." *Leather's Best,* 451 F.2d at 813. In addition to *Leather's Best,* plaintiffs rely on *Minemet Inc. v. M.V. Mor-*

*macdraco,* 536 F.Supp. 769, 771 (S.D.N.Y.), *aff'd without opinion,* 714 F.2d 115 (2d Cir. 1982). *See also Stein Hall & Co., Inc. v. S.S. Concordia Viking,* 494 F.2d 287, 289 (2d Cir.1974) (once the stevedore, as terminal operator, took possession of the cargo, it became a bailee for the mutual benefit of the carrier and consignees).

Yang Ming fruitlessly attempts to distinguish *Leather's Best* and *Minemet* as situations involving the entrustment of the goods by a shipping company for warehousing, rather than for inland carriage. The Court sees no reason why this factual distinction should matter for purposes of bailment analysis. Moreover, it is clear that state law permits owners to sue subcontracting carriers under bailment theory; the owner need not be a party to the contract between the original carrier and subcontracting carrier. *Berger v. 34th St. Garage,* 274 A.D. 414, 84 N.Y.S.2d 348 (1st Dept.1948). This conclusion was implicit in *Minemet,* where the terminal operator was not a party to the bill of lading but nevertheless was held liable as bailee. 536 F.Supp. at 770. For all these reasons, the Court accepts plaintiffs' bailment theory as the law governing ATSF's liability and damages. Plaintiffs' evidence of nondelivery of the goods therefore establishes a *prima facie* case of liability which stands unrebutted. *See id.* at 771. In consequence, plaintiffs are entitled to summary judgment against ATSF on the issue of liability.

*Damages*

Assuming *arguendo* that the Carmack Amendment does not apply, ATSF nevertheless argues that plaintiffs' damages are limited on either of two theories. First, ATSF relies on a limiting clause in an intermodal circular which, ATSF argues, binds plaintiffs either directly or by virtue of its alleged incorporation into the Yang Ming bill of lading. Second, ATSF argues that its liability is limited to the same extent as Yang Ming's by Clause 26(1) of the bill of lading.

*1. The Intermodal Circular*

■ The intermodal circular, allegedly in effect at the relevant time, contains the following limitation in item 52(5): "In no event shall ATSF be liable for special or consequential damages." (Jones Aff. ¶ 5 and attachment.) The absence of any signature of a Braha representative, together with the evidence that Braha did not arrange for the transportation by ATSF and plaintiffs' uncontradicted insistence they were not even aware the circular existed, renders ineffectual ATSF's effort to claim that plaintiffs are bound directly to any terms in the circular. *See also Co-Operative Shippers v. Atchison, Topeka & Santa Fe Ry. Co.,* 840 F.2d 447, 451 (7th Cir.1988) (carriers may limit their liability only if the shipper has notice of the rate structure and is given a full and fair opportunity to obtain greater protection).

ATSF argues next that the circular was incorporated into the Yang Ming bill of lading by Clause 5(C), which provides in relevant part:

"RESPONSIBILITY FOR THROUGH TRANSPORTATION—Where the place of receipt and/or place of delivery of the Goods is an inland point, the responsibility of the Carrier with respect to the Through Transportation of the Goods shall be as follows:

"(1) * * * With respect to inland transportation in the United States either prior to or subsequent to the time the Carrier has custody of the Goods or Containers, such inland carriage will be governed by and subject to the terms and conditions of the Underlying Carriers' Bill of Lading and/or the ICC Uniform bill [*sic*] of Lading where applicable, together with the Underlying Carriers' Tariff which shall be incorporated herein as if set forth at length. Notwithstanding the above, in the event there shall be a private contract of carriage between the Carrier and any Agent or independent contractor representing the Carrier, such inland carriage will be governed by the terms and conditions of said contract which shall be incorporated as if set forth at length and copies of said contract shall be available to the merchant at any time of the Carrier upon request.

\* \* \* \* \* \*

"(4) With respect to carriage often [*sic*] Goods which is not [otherwise provided for] above, then according to the Underlying Carrier contract of carriage and tariffs, or in the absence of such contracts or tariffs, according the International Law of the State in which legal action is instituted."

A line of cases dealing with the incorporation by reference of the terms of a charter party [18] is illuminating. The applicable principles from this line of cases have been summarized as follows:

"It is, of course, clear that the terms of a charter party, including an arbitration clause, may, by appropriate reference, be incorporated into a bill of lading. . . . It is also clear that, in an appropriate case, a holder of such a bill of lading may be bound to arbitrate his disputes from the bill of lading, even though he himself may not have been signatory to the underlying charter party which is incorporated. . . . However, an incomplete or inaccurate reference to a charter party in a bill of lading may prove insufficient to incorporate the charter party to the bill of lading . . . at least when the party sought to be compelled is a stranger to the underlying charter party." *Coastal States Trading, Inc. v. Zenith Navigations S.A.*, 446 F.Supp. 330, 337 (S.D.N.Y.1977) (citing, e.g., *Lowry & Co. v. S.S. Nadir*, 223 F.Supp. 871 (S.D.N.Y.1963); *Southwestern Sugar & Molasses Co. v. The Eliza Jane Nicholson*, 126 F.Supp. 666 (S.D.N.Y.1954)).

Here, Clause 5© of the bill of lading does not even approach a complete and accurate incorporation of the intermodal circular. The existence, let alone the incorporation, of the circular is far from clear from Clause 5(C). Consequently, the circular cannot be considered incorporated into the bill of lading and binding in that manner upon plaintiffs.

### 2. *Effect of Clause 26(1)*

 ATSF argues also that its liability is limited by Clause 26(1) which, in relevant part states that all claims against the "Carrier . . . shall be adjusted and settled on the basis of the net invoice value of the goods. . . . [and] [i]n no event shall the Carrier be liable for any loss of profit or consequential damages."

It is significant that the term "Carrier," as defined by the bill of lading, includes not only Yang Ming, but also "any underlying carrier whether acting as Carrier or bailee." The term "Underlying Carrier" is defined to include any rail or other carrier "utilized by the Carrier for any part of the transportation of the shipment." (Plansker Aff. Ex. A, Cl. 1(b)–(c)) Accordingly, the clear meaning of the bill of lading is to limit the liability of an "underlying carrier" such as ATSF to the same extent as Clause 26(1) limits the liability of Yang Ming. In consequence, plaintiffs' recovery for the cargo loss against ATSF is limited to $51,282.

 Alternatively, the liability of ATSF for the cargo loss is limited to $51,282, the same amount as Yang Ming's liability, by virtue of Clause 2 of the bill of lading, which operates as a "Himalaya clause." A "Himalaya clause" signifies an extension of a beneficial clause, such as limitations of liability, to a party other than the carrier and party to a bill of lading. *Brown & Root, Inc. v. M/V Peisander*, 648 F.2d 415, 417 n. 5 (5th Cir. 1981). Clause 2 states in relevant part that if any other carrier is deemed "carrier or bailee of the Goods or under any responsibility with respect thereto, all exemptions and limitations of and exoneration from liability provided by law or by terms hereof shall be available to such other." (Plansker Aff. Ex. A.) Consequently, Clause 2 serves effectively as a Himalaya clause limiting ATSF's liability to the same extent as Yang Ming's. *Cf. Mikinberg v. Baltic Steamship Co.*, 988 F.2d 327, 332 (2d Cir.1993).

Accordingly, plaintiffs are entitled to summary judgment in the amount of $51,282 against ATSF, and ATSF is entitled to summary judgment dismissing plaintiffs' claim to the extent it exceeds that amount.

### *Prejudgment Interest*

 Although ATSF protests plaintiffs' entitlement to prejudgment interest, New

---

**18.** A "charter party" is a contract by which a ship, or some principal part of it, is let by the owner for a specified time or use. BALLENTINE's LAW DICTIONARY 195 (3d ed. 1969).

**428**

York law approves an award of prejudgment interest under N.Y. CPLR 5001(a)–(b) (McKinney 1995 Supp.), which provides in relevant part:

> "Interest shall be recovered upon a sum awarded because of a breach of performance of a contract or because of an act ... depriving or otherwise interfering with title to, or possession or enjoyment of property.... Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages shall be incurred thereafter shall be computed from the date incurred."

This rule has been interpreted generously. *See, e.g., Nikolis v. Reznick,* 214 A.D.2d 658, 625 N.Y.S.2d 580 (2d Dept.1995) (award of prejudgment interest is appropriate even where contract was silent as to the calculation of interest); *Maro Leather Co. v. Aerolineas Argentinas,* 161 Misc.2d 920, 922, 617 N.Y.S.2d 617, 618 (1st Dept.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995) ("prejudgment interest, while not specifically mentioned in the Warsaw Convention, is allowable in cargo loss case since it speeds settlement and recovery and fully compensates the successful plaintiff for the time and value of its money that defendant enjoyed from the delay in payment"). The language of the statute requires the award of prejudgment interest against both defendants.

Prejudgment interest should be assessed from the date of cargo loss, *Maro Leather,* 161 Misc.2d at 922, 617 N.Y.S.2d at 618, which was August 8, 1993. (Jones Aff. ¶ 6.) [19]

### Conclusion

Plaintiffs are granted summary judgment against defendants Yang Ming and ATSF, jointly and severally, in the amount of $51,282 plus prejudgment interest dating from August 8, 1993.

SO ORDERED.

---

**19.** Plaintiffs initially requested prejudgment interest from August 13, 1995, the date of the letter notifying them of the destruction (Plansker Aff. Ex. C), presumably because they lacked information as to an earlier date of the accident.